UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MORRIS E. RIMES, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 19-CV-0282-CVE-JFJ |
| | ) |
| MVT SERVICES, LLC, a New Mexico, | ) |
| limited liability company d/b/a | ) |
| Mesilla Valley Transportation, | ) |
| and CECILIO PORTILLO, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the Court is defendants MVT Services, LLC's (MVT's) and Cecilio Portillo's motion for partial summary judgment (Dkt. # 60). In this rear-end tractor-trailer truck collision case, plaintiff argues that Portillo was operating his vehicle in snowy conditions while allegedly fatigued, due to alleged insufficient rest and/or diabetes. Defendants argue that Portillo was not fatigued because he allegedly rested the requisite ten hours required by Federal Motor Carrier Safety Administration (FMCSA) regulations and guidance, and he was operating under a valid FMCSA medical certificate for his diabetes.

Plaintiff sued defendants on theories of negligence against MVT Services, LLC (MVT) and Portillo, negligent hiring and retention against MVT,[1] and negligent entrustment against MVT, and seeks punitive damages against both defendants. Dkt. # 2. MVT seeks seek partial summary judgment on the issue of negligent entrustment and both defendants seek partial summary judgment

---

[1]   The negligent hiring and retention claim was ruled moot in a prior opinion and order. Dkt. # 21.

as to punitive damages. Plaintiff has filed a response (Dk. # 87), defendants have filed a reply (Dkt. # 114), and plaintiff has filed a surreply (Dkt. # 120).

**I.**

The following facts are undisputed: At 9:34 a.m. on January 15, 2018, plaintiff was driving his tractor-trailer truck on Interstate 44 near Miami, Oklahoma when he was struck from behind by a tractor-trailer driven by Portillo. Dkt. ## 60, at 7; 87, at 7; 60-1, at 1. At the time of the collision, Portillo was operating his tractor-trailer truck as an agent for MVT within the course and scope of his dispatch for MVT.[2] Dkt. ## 60, at 7; 87, at 7. The normal speed limit for the stretch of turnpike highway where the accident occurred is seventy-five miles per hour maximum and fifty miles per hour minimum. Id. It was snowing at the time of the collision. Id. Plaintiff was traveling ten to twenty miles per hour uphill and Portillo was traveling forty to fifty miles per hour at the time of the collision. Id.; Dkt. # 60-1, at 3. Plaintiff's expert stated that Portillo's driver tracking program showed that Portillo "had slowed to around 42 mph in the minutes before the wreck" and "various slow speeds for the turnpike compared to the speeds one would expect if it was not snowing." Dkt. ## 60, at 7-8; 87, at 7. Plaintiff's expert stated in his deposition that Portillo's last recorded speed before the accident was forty-seven miles per hour. Dkt. ## 60, at 8; 87, at 7. The traffic collision report shows that neither driver was distracted. Dkt. # 60-1, at 3. Both vehicles were "apparently normal" at the time of the collision. Id. at 3.

---

[2] Plaintiff alleges that Portillo "was not just an agent of MVT as stated . . . [but] he was in fact MVT's statutory employee pursuant to federal regulations." Dkt. # 87, at 7. The Court finds this immaterial because defendants admit that Portillo was acting within the course and scope of his employment with MVT when the collision occurred; thus, if Portillo is found negligent, MVT is negligent under the theory of respondeat superior.

2

Portillo was ticketed by Trooper Jon Ysbrand, the investigating officer, for traveling too fast for the weather conditions. Dkt. ## 60, at 8; 87, at 7; 60-1, at 3. Plaintiff stated in his deposition that, before the time of the collision, he had slowed due to traffic in front of him. Dkt. ## 60, at 8; 87, at 7. He also stated in his deposition that he "was trying to get up to about 30 or 40" miles per hour at the time of the collision. Dkt. # 60-6, at 3. Plaintiff also stated in his deposition that he does not believe that Portillo hit him on purpose, and that he does not believe the collision was anything other than an accident. Dkt. # 60-6, at 5. Plaintiff's expert accident reconstructionist, Ron Blevins, stated in his deposition:

> Q: Okay. So it is your opinion that Mr. Portillo caused the accident because he didn't brake in time and avoid?
>
> A: Correct.
>
> Q: And he either should have braked and slowed down behind Mr. Rimes or he should have pulled into the other lane?
>
> A: Correct.
>
> Q: And it is your opinion that he actually was just going too fast?
>
> A: <u>No, his speed didn't cause the wreck. It's the failure to slow that caused the wreck.</u>
>
> Q: So he should have stopped faster and that caused the wreck?
>
> A: Sooner.
>
> Q: Sooner?
>
> A: Yes.
>
> Q: Okay. He should have stopped sooner?
>
> A: Correct.

> Q: By the time he did apply the brake, it was already too late?
>
> A: In my opinion, yes.
>
> Q: Okay.
>
> A: And you were saying stop. He didn't have to stop because the vehicle in front of him is moving, but he should have slowed some.
>
> Q: So let's try to rephrase this then, clear it up a little bit. He should have either slowed down or moved to the other lane to avoid hitting Mr. Rimes?
>
> A: Yes.
>
> Q: And by the time he started slowing down, it was already too late to avoid hitting Mr. Rimes?
>
> A: That's my understanding, yes.
>
> Q: And it is your understanding that he actually did hit the brake, it was just too late to avoid the accident?
>
> A: Well, his deposition testimony is that he was driving in the left lane and he had no reason to hit his brakes, that Mr. Rimes moved over into him, but in his statement to the trooper he said that he hit his brakes, and I assume that that's correct.

Dkt. ## 60, at 8-9; 87, at 7; 60-3, at 12 (emphasis added). Blevins also stated that he believed Portillo's speed was reasonable under the circumstances. Dkt. # 60-3, at 13. Trooper Ysbrand stated: "Mr. Portillo stated he was unable to stop and collided with the rear of Mr. Rimes' trailer. As he attempted to brake, his truck went into a skid striking the rear of Mr. Rimes' trailer. Mr. Portillo tried to steer away but all he accomplished was the cab turn sideways in the skid." Dkt. ## 60, at 9; 87, at 8; 60-5, at 1.

Prior to the collision, Portillo had not worked from January 6 to January 13, 2018.[3] Dkt. ## 60, at 10; 87, at 8; 60-7, at 1-6. On January 14, 2018, the day before the collision, Portillo exceeded the FMCSA maximum drive time, of eleven hours in a fourteen hour period, by four or sixteen minutes.[4] Dkt. ## 60, at 10; 87, at 8; 60-7, at 8-9. FMCSA regulations state that, after driving eleven or more hours in a fourteen hour period, "[a] driver may not drive without first taking 10 consecutive hours of off duty." 49 C.F.R. § 395.3(a)(1). However, if the commercial vehicle is equipped with a sleeper berth, as Portillo's was, the FMCSA regulations allow "[a]t least 8 but less than 10 consecutive hours in a sleeper berth, and . . . [a] separate period of at least 2 but less than 10 consecutive hours either in the sleeper berth or off duty, or any combination thereof." 49 C.F.R. § 395.1(g)(1)(ii). Blevins did <u>not</u> opine that Portillo was operating in violation of these regulations on the date of the accident; however, this specific question was not asked in his deposition. Dkt. ##

---

[3] Plaintiff points out that Portillo likely traveled 55.2 miles on January 13, 2018. Dkt. # 87, at 8. He also provides evidence through his expert that Portillo may have falsified his driver's log for that day. <u>Id.</u> Defendants argue that this travel was for personal reasons, not in the course and scope of Portillo's employment. Dkt. # 114, at 2. Portillo owned the vehicle, and was allowed to drive it as a personal conveyance when not operating commercially. <u>See</u> Dkt. # 114, at 2; FMCSA Personal Conveyance Rules, https://www.fmcsa.dot.gov/regulations/hours-service/personal-conveyance (last visited May 20, 2020). The Court finds that the January 13, 2018 travel is immaterial to the claim of negligent entrustment.

[4] Defendants point out that FMCSA regulations allow a driver to operate up to two additional hours per day if experiencing adverse conditions. Dkt. # 114, at 7-8 (citing 49 C.F.R. § 395.1(b) (allowing "a driver who encounters adverse conditions" to "drive and be permitted or required to drive a commercial vehicle for not more than 2 additional hours beyond the maximum time allowed under §§ 395.3(a) or 395.5(a) to complete that run or to reach a place offering safety for the occupants of the commercial motor vehicle and security for the commercial motor vehicle and its cargo.")). However, there is no evidence in the record that there was inclement weather or other adverse conditions on January 14, 2018.

5

60, at 10; 87, at 9. He did state in his expert report that Portillo stopped to rest in Stroud, Oklahoma, on January 14, 2018. Dkt. # 87-3, at 3.

Portillo had been diagnosed with type 2 diabetes, and MVT was aware of this diagnosis. Dkt. ## 60, at 11; 87, at 9. Portillo was issued an FMCSA medical certificate by an FMCSA approved physician showing that he was fit to operate a commercial motor vehicle under FMCSA standards at the time of the collision, and he was operating under that medical certificate. Dkt. ## 60, at 11; 87, at 9. At his last FMCSA physical three months before the collision, on October 27, 2017, Portillo had a urine test sugar level of 500 mg and a fingerstick blood test sugar level of 205.[5] Dkt. ## 60, at 11; 87, at 10; 60-11, at 25. Portillo disclosed to the FMCSA physician that he was treated for diabetes with the medication Glucovance. Dkt. ## 60, at 11; 87, at 10. FMCSA regulations disqualify a person from operating a commercial vehicle if that person is being treated with insulin for diabetes. 49 C.F.R. § 391.41(b)(3); see also Dkt. # 87-17, at 4. Portillo's treating physician did not recommend that Portillo's diabetes be treated with injectable insulin. Dkt. ## 60, at 11; 87, at 10. None of plaintiff's expert witnesses opined that Portillo's diabetes was required to be treated with insulin at any time. Dkt. ## 60, at 12; 87, at 10.

The following are the allegedly disputed material facts: Defendants assert that, after exceeding eleven hours of drive time, Portillo stopped to rest in Stroud at 7:44 p.m. on January 14, 2018, and began driving again at 5:49 a.m. on January 15, 2018, a total of ten hours and five minutes, greater than the ten hour requirement. Dkt. ## 60, at 10; 60-7, at 9-10; 60-8, at 2. Plaintiff

---

[5]  Defendants corrected this statement to a fingerstick blood test sugar level of 207. Dkt. # 114, at 5; see Dkt. # 87-13, at 15.

argues that Portillo was traveling at 10:01 p.m. on January 14, 2018, breaking up the required eight consecutive hours of rest time. Dkt. ## 87, at 9; 87-6, at 2.

Plaintiff alleges that Portillo regularly falsified his medical history since 2005 in connection with his commercial driver's license (CDL) driver qualification examinations. Dkt. ## 87, at 13; 87-1, at 8. Plaintiff also alleges that Portillo knew that he needed insulin to control his diabetes, Dkt. ## 87, at 14; 87-1, at 12, and that Portillo's medical certificates contained numerous warnings regarding his diabetes. Dkt. ## 87 at 14; 87-12, at 13.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

## III.

### A.

### Negligent Entrustment

Plaintiff opposes partial summary judgment on this claim based on two theories: fatigue caused by insufficient rest and fatigue caused by diabetes. First, plaintiff argues that the driver's logs show that Portillo was out of compliance with FMCSA regulations by failure to rest the requisite hours. Second, plaintiff argues that Portillo's diabetes caused him to be fatigued, which caused or contributed to the collision.

#### i.  Elements of Negligent Entrustment Claim

"Negligent entrustment of an automobile occurs when the automobile is supplied, directly or through a third person, for the use of another whom the supplier knows, or should know, because of youth, inexperience, or otherwise, is likely to use it in a manner involving unreasonable risk of bodily harm to others . . . ." Sheffer v. Carolina Forge Co., LLC, 306 P.3d 544, 548 (Okla. 2013). To establish a claim of negligent entrustment, the plaintiff must show that a reasonable person knew or should have known that the person entrusted with the vehicle would be likely to operate it in a

careless, reckless, or incompetent manner. Green v. Harris, 70 P.3d 866, 869 (Okla. 2003). A necessary element of a negligent entrustment claim is that the plaintiff's injury result from the driver's careless or reckless operation of the vehicle. Clark v. Turner, 99 P.3d 736, 743 (Okla. Civ. App. 2004).

ii. There is No Evidence that MVT Negligently Entrusted the Vehicle to Portillo Based on His Failure to Rest

The arguments relating to Portillo's rest time the night before and morning of the collision are as follows. Defendants argue that Portillo was not disqualified from operating under MVT's dispatch due to his ten hour rest following a drive slightly in excess of eleven hours the day before. Dkt. # 60, at 14. Plaintiff argues that Portillo "was not only traveling at a speed that was excessive for the conditions at the time, but was doing so after exceeding the maximum hours rules and failing to get adequate rest the day before the collision." Dkt. # 87, at 18.

FMCSA regulations state that, after driving eleven or more hours in a fourteen hour period, "[a] driver may not drive without first taking 10 consecutive hours of off duty." 49 C.F.R. § 395.3(a)(1). However, if the commercial vehicle is equipped with a sleeper berth, as Portillo's was, the FMCSA regulations provide:

> A driver who operates a property-carrying commercial motor vehicle equipped with a sleeper berth . . .
>
> (A) Must, before driving, accumulate
>
> > (1) At least 10 consecutive hours off duty;
> >
> > (2) At least 10 consecutive hours of sleeper-berth time; [or]
> >
> > (3) A combination of consecutive sleeper-berth and off-duty time amounting to at least 10 hours . . . .

Id. § 395.1(g)(1)(i). The regulations also provide:

> (A) The term "equivalent of at least 10 consecutive hours off duty means a period of
>
> > (1) At least 8 but less than 10 consecutive hours in a sleeper berth, and
> >
> > (2) A separate period of at least 2 but less than 10 consecutive hours either in the sleeper berth or off duty, or any combination thereof.

Id. § 395.1(g)(1)(ii).

It is undisputed that Portillo drove more than eleven hours—four minutes according to defendants and sixteen minutes according to plaintiff—on January 14, 2018. Dkt. ## 60, at 10; 87, at 8; 60-7, at 8-9. Therefore, assuming there was no inclement weather on January 14 (as there is nothing in the record to suggest there was), see 49 C.F.R. § 395.1(b), he was required to rest either ten consecutive hours or eight hours consecutively followed by two hours in the sleeper berth or off duty, or a combination thereof. The evidence clearly shows that Portillo rested over ten consecutive hours in Stroud, Oklahoma. There are three electronic logs of Portillo's vehicle location in the record: (1) the driver's log, a commercially available electronic log tracking system in the vehicle, known as "PeopleNet Fleet Manager" (Dkt. # 60-7; MVT_000023-MVT_000024); (2) a GPS location history log (Dkt. # 114-1; MVT_001488); (3) and a second GPS location history log, identified as ICC-MCLOCAT, an intermittent GPS log that shows Portillo's location at 7:40 p.m. but not again until 10:01 p.m. on January 14 (Dkt. # 87-6). All of the logs confirm that Portillo was in Stroud, Oklahoma, the night before and the morning of the collision. The PeopleNet Fleet Manager log shows that Portillo was in Stroud at 7:44 p.m. on January 14, 2018, and that he did not change locations until 5:49 a.m. on January 15, 2018. Dkt. # 60-7, at 9-10. The GPS location history log confirms that Portillo was in Davenport, Oklahoma at 7:40 p.m. on January 14, 2018.

Dkt. # 114-1, at 3. He then drove three miles to Stroud between 7:40 p.m. and 7:43 p.m., and was in Stroud by 7:44 p.m. on January 14, 2018. Id. In this log, from 7:44 p.m. on January 14, 2018, to 5:47 a.m. on January 15, 2018, Portillo was in Stroud with no tracked mileage. Id. The ICC-MCLOCAT intermittent location history log shows that Portillo was in Davenport, Oklahoma at 7:40 p.m. on January 14, 2018, Dkt. # 87-6, at 2, followed by a recording at 10:01 p.m. on January 14, 2018, showing that Portillo was in Stroud. Id. Plaintiff argues that this last log shows that Portillo was driving one mile per hour for three miles at 10:01 p.m. and, thus, Portillo did not rest eight consecutive hours. Dkt. # 120, at 2. However, the only thing this log shows is that Portillo was in Davenport at 7:40 p.m. and was in Stroud at the time the GPS recorded again at 10:01 p.m. It does not show when Portillo traveled the three miles from Davenport at 7:40 to Stroud. But the other two logs clearly show these three miles were driven from 7:40-7:43 p.m. The Court finds that there is no genuine dispute of material fact; Portillo clearly rested over ten hours consecutively after driving eleven hours in a fourteen hour period, from 7:44 p.m. on January 14, 2018, to 5:47 a.m. or 5:49 a.m. on January 15, 2018, and, thus, he complied with FMCSA regulations. Plaintiff has merely raised a "metaphysical doubt" as to Portillo's driving status at 10:01 p.m. because the last log did not record travel between 7:40-10:01 p.m., but the record as a whole demonstrates that Portillo rested for ten consecutive hours. See Matsushita Elec. Indus. Co., 475 U.S. at 586-87 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'").

Plaintiff has no other evidence that Portillo was fatigued due to failure to rest. In fact, plaintiff admitted that the collision was nothing but an accident. Dkt. # 60-6, at 5. His accident

11

reconstructionist opined that the collision was caused by Portillo's failure to slow down; he did not mention failure to rest. Dkt. # 60-3, at 12. Therefore, as a matter of law, MVT could not have negligently entrusted the commercial vehicle to Portillo the morning of January 15 based on his alleged failure to rest. The Court finds that there is no genuine dispute of material fact that Portillo rested the requisite time the night before and the early hours of the collision date, and that MVT did not negligently entrust the dispatch to Portillo the morning of the collision.[6]

### iii. There is No Evidence that MVT Negligently Entrusted the Vehicle to Portillo Based on His Diabetes

The arguments relating to Portillo's diabetes are as follows. Defendants argue that, because Portillo was operating under a valid FMCSA medical certificate at the time of the collision, MVT could not have negligently entrusted the commercial vehicle to Portillo based on diabetes. Dkt. # 60, at 16. The FMCSA medical certificate had been issued for the one-year period of October 2017 to October 2018. Id. Defendants state that the FMCSA medical card was issued by an FMCSA approved physician and had not been recalled by that physician. Id. Defendants also argue that Portillo was not treated with insulin and, therefore, he was in compliance with FMCSA regulations. Id. at 17. Finally, defendants argue that plaintiff has failed to produce an expert witness who will testify that Portillo should have been treated with injectable insulin or that he was fatigued due to diabetes. Id. Plaintiff argues that Portillo's "dangerous diabetes" contributed to his alleged fatigue, which allegedly caused or contributed to the collision. Dkt. # 87, at 17. Plaintiff also argues that

---

[6] Plaintiff argues that the decision in Byrd v. Ace American Ins. Co., 2018 WL 1569499, at *1 (N.D. Okla. March 30, 2018), applies to this case. However, in Byrd, this Court found that the driver had exceeded his maximum hours of service, and he suffered from sleep apnea. Id. at *3. Here, Portillo rested the requisite hours after exceeding the legal hours of service. Moreover, he did not suffer from a condition, such as sleep apnea, that would obviously have caused or contributed to the collision.

the physicians who approved Portillo's medical card were specifically approved by MVT. Id. at 18. Plaintiff argues that MVT was well aware that Portillo's blood sugar range far exceeded the normal range. Id. at 19. Finally, plaintiff argues that expert testimony is not required because this is not a medical malpractice case. Id. at 19-20.

"Courts generally require expert evidence when a condition would be unfamiliar to a lay jury and only an expert could diagnose that condition." Tesone v. Empire Mktg. Strategies, 942 F.3d 979, 996 (10th Cir. 2019) (internal quotation marks omitted); see also Williams v. New Beginnings Residential Care Home, 225 P.3d 17, 30 (Okla. Civ. App. 2009) ("Expert testimony must be adduced where any foundational fact requires a degree of skill or knowledge not possessed by the average person."). "[A] lay witness is competent to testify concerning those physical injuries and conditions which are susceptible to observation by an ordinary person." Tesone, 942 F.3d at 996. However, "where injuries complained of are of such character as to require skilled and professional persons to determine the cause and extent thereof, they must be proved by the testimony of medical experts." Id. at 997. "The Oklahoma Supreme Court has frequently found expert testimony necessary to establish medical causation '[w]here injuries are of a character requiring skilled and professional men to determine the cause and extent thereof.'" Alexander v. Smith & Nephew, P.L.C., 98 F. Supp. 2d 1287, 1295 (N.D. Okla. 2000) (quoting Williams v. Safeway Stores, Inc., 515 P.2d 223, 227 (Okla. 1973)).

Here, it would not be obvious to an average person that a urine test sugar level of 500 mg and a fingerstick blood test sugar level of 207 three months before the collision would or could have

caused Portillo to be fatigued the morning of the collision.[7]  It would also not be obvious to an average person that Portillo allegedly should have been prescribed insulin, or whether the FMCSA physicians who approved Portillo's FMCSA medical certificate were acting outside of professional standards.  See Harder, 948 P.2d at 305 (noting that, ordinarily, in a medical malpractice case, negligence must be established by expert medical testimony).  Plaintiff argues that MVT specifically approved the FMCSA physicians, Dkt. # 87, at 18, but plaintiff has cited no law requiring that an FMCSA physician be independently appointed.  Plaintiff has produced no expert medical witness who would testify to how Portillo's elevated levels of blood sugar three months earlier caused or contributed to the collision or what his blood sugar was the morning of the collision.  The time to designate experts and exchange reports has long expired, and discovery closed in February 2020.[8]  See Dkt. # 34.  Moreover, plaintiff's accident reconstructionist expert opined that the accident was caused by not braking sooner (failure to adequately slow).  Dkt. # 60-3, at 12.  Plaintiff himself stated in his deposition that he did not believe the collision was anything other than an accident.  Dkt. # 60-6, at 5.  The fact remains that Portillo and MVT were in compliance with FMCSA

---

[7]   Plaintiff attached an FMCSA Medical Examiner Handbook that states: "Some of the factors related to commercial driving that affect blood glucose control include: Fatigue . . . ." Dkt. # 87-17, at 3.  This statement implies that fatigue could make blood glucose levels worse; it does not imply that diabetes causes fatigue, as plaintiff argues.  The Handbook further states: "Poor blood glucose control can lead to fatigue, lethargy, and sluggishness." Id. at 4.  Even if there were a risk that Portillo could have been fatigued due to his diabetes, plaintiff has offered no expert opinions that he was, and Portillo was operating under a valid FMCSA medical certificate.

[8]   Plaintiff asked that he be granted a sixty-day extension to allow his expert to address this issue because he "has . . . been unable to review the medical records . . . ." Dkt. ## 87, at 11; 120, at 4-5.  The Court will not grant plaintiff additional time to produce an expert's report, because plaintiff objected to defendants' request for an extension of time (Dkt. # 26), and the discovery deadline passed three months ago.  Dkt. # 34.  Further, the discovery deadline has already been extended by sixty days.  Dkt. # 33.

regulations because Portillo was not prescribed or taking insulin,[9] and he was operating under a valid FMCSA medical certificate at the time of the collision. The evidence is insufficient to support a claim for negligent entrustment. However, even if MVT did negligently entrust the vehicle to Portillo based upon his diabetes, there is no evidence in the record that Portillo's diabetes caused or contributed to the collision. See Clark v. Turner, 99 P.3d at 743. The record fails to demonstrate that Portillo failed to slow down or move to another lane due to a diabetic episode or complications from diabetes. Therefore, the Court finds no genuine dispute of material fact that MVT did not negligently entrust Portillo's vehicle to him based on his diabetes. The Court finds that defendants' motion for partial summary judgment as to negligent entrustment should be granted.

**B.**

**Punitive Damages**

Plaintiff argues that his request for punitive damages must be submitted to the jury, Dkt. # 87, at 20, allegedly because both defendants acted with the requisite levels of willfulness and reckless disregard because Portillo "drove too long and rested too little despite knowing that he had uncontrolled, untreated diabetes, a disease that would, at a minimum, exacerbate his fatigue." Id. at 22. Defendants argue that Portillo's fatigue, speed, and/or diabetes did not cause the accident and, therefore, Portillo did not have the requisite level of recklessness to warrant submission of punitive damages to the jury. Dkt. # 60, at 25-26.

Punitive damages may be awarded only if the plaintiff shows by clear and convincing evidence that the defendant has been "guilty of reckless disregard for the rights of others." OKLA.

---

[9]  Plaintiff argues that defendants have been uncooperative in producing Portillo's medical records from Mexico. However, plaintiff still could have designated an expert and produced his report based on the medical records that were produced.

15

STAT. tit. 23, § 9.1; Rodebush by and through Rodebush v. Oklahoma Nursing Homes, Ltd., 867 P.2d 1241, 1251 (Okla. 1993). A person acts in reckless disregard for the rights of others if he "was either aware, or did not care, that there was a substantial and unnecessary risk that [his] conduct would cause serious injury to others." Gowens v. Barstow, 364 P.3d 644, 652 (Okla. 2015). The trial court must determine as a matter of law whether the plaintiff has produced sufficient evidence that a reasonable jury could find that a defendant acted with reckless disregard before instructing the jury as to punitive damages. Badillo v. Mid Century Ins. Co., 121 P.3d 1080, 1106 (Okla. 2005).[10]

"Punitive damages are those damages which are given because of the wanton, reckless, malicious, or oppressive character of the acts of the defendant." Wagoner v. Bennett, 814 P.2d 476, 478 (Okla. 1991); Hamilton v. Amwar Petroleum Co., Inc., 769 P.2d 146, 149 (Okla. 1989); Slocum v. Phillips Petroleum Co., 678 P.2d 716, 719 (Okla. 1983). "They are meant to punish the wrongdoers and to act as a deterrent to others." Wagoner, 814 P.2d at 478. As the Oklahoma Supreme Court has explained:

> The intent in willful and wanton misconduct is not an intent to cause the injury; it is an intent to do an act—or the failure to do an act—in reckless disregard of the consequences and under such circumstances that a reasonable man would know, or have reason to know, that such conduct would be likely to result in substantial harm to another.

Graham v. Keuchel, 847 P.2d 342, 362 (Okla. 1993).

---

[10] "Oklahoma's jurisprudence also holds that punitive or exemplary damages may be awarded against the principal for a servant's act under the doctrine of respondeat superior." Jordan v. Cates, 935 P.2d 289, 292 (Okla. 1997). An employer may therefore be held liable for the employees's intentional tort "when the act is one which is fairly and naturally incident to the business and is done while the servant was engaged upon the master's business . . . ." Rodebush, 867 P.2d at 1245 (internal quotation marks omitted).

The traffic collision report contains no evidence of indifference to or a reckless disregard of the health or safety of others. Dkt. # 60-1, at 3. Both vehicles were traveling uphill. Id. The conditions were snowy at the time of the collision. Id. There is no evidence Portillo was distracted when he struck plaintiff from behind. Id. at 3, 4. Plaintiff himself stated in his deposition that he did not believe the collision was anything other than an accident. Dkt. # 60-6, at 5. Plaintiff's accident reconstructionist stated in his deposition that it was Portillo's failure to slow down, not his fatigue or speed, that caused the collision. Dkt. # 60-3, at 12. In addition, Portillo was operating under a valid FMCSA medical certificate for his diabetes. Dkt. ## 60, at 11; 87, at 9. While his medical doctors were concerned about his diabetes, they did not deny a medical certificate. The Court has found no genuine dispute of material fact that Portillo failed to rest more than ten consecutive hours that ended four hours before the rear-end collision.

Plaintiff seems to argue that a standard less than reckless disregard of the consequences applies under Oklahoma law. Dkt. # 87, at 21. However, Graham v. Keuchel, 847 P.2d 342, 362 (Okla. 1993), makes clear that there must be "willful and wanton misconduct," which is "an intent to do an act—or failure to do an act—in reckless disregard of the consequences and under such circumstances that a reasonable man would know, or have reason to know, that such conduct would be likely to result in substantial harm to another." Id. (emphasis added). Here, neither prong of the willful and wanton misconduct definition is met. This is a rear-end tractor-trailer truck collision case in which both vehicles were traveling uphill in snowy conditions. Portillo was traveling under the minimum speed required for that stretch of highway. Plaintiff's expert testified that it was Portillo's failure to slow down that caused the accident. In sum, there is no evidence of willful and wanton misconduct and, thus, as a matter of Oklahoma law, punitive damages are unwarranted. Therefore,

the Court finds that defendants' motions for partial summary judgment as to punitive damages should be granted.

**IT IS THEREFORE ORDERED** that defendants' motion for partial summary judgment (Dkt. # 60) is **granted**: partial summary judgment is entered for MVT on the negligent entrustment claim, and partial summary judgment is entered for MVT and Portillo on the request for punitive damages.

**DATED** this 20th day of May, 2020.

_____<br>
CLAIRE V. EAGAN<br>
UNITED STATES DISTRICT JUDGE